IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  Criminal Action No. 5:14-cr-19-01

GLENN A. MILLER

      Defendant.

## REPORT AND RECOMMENDATION CONCERNING DEFENDANT'S MOTION TO DISMISS FOR BREACH OF NON-PROSECUTION AGREEMENT

This matter comes before the Court on Defendant's Motion to Dismiss for Breach of Non-Prosecution Agreement filed on April 25, 2014.[1] The United States filed a Response in Opposition on May 2, 2014.[2] The Court held an evidentiary hearing and argument on Defendant's motion on July 24, 2014. Defendant appeared in person and by his counsel Paul J. Harris, Esq., and Shawn L. Fluharty, Esq. The United States of America (hereinafter "the Government") appeared by Robert H. McWilliams, in person. Defendant presented the testimony of Marshall County Drug Task Force Officer Keith McCallen ("McCallen"). The Government presented the testimony of Marshall County Drug Task Force Officers Michael Baker ("Baker") and James Matthews ("Matthews"). The parties offered the following exhibits: (1) Defendant's Exhibit One, an agreement between Defendant and the Marshall County Drug Task Force; (2) Government's Exhibit One, a DVD of two meetings

---

[1] Dkt. No. 22.

[2] Dkt. No. 24. On July 23, 2014, the day before the hearing, the United States filed a supplemental response to Defendant's Motion. (Dkt. No. 66.) Defendant filed a brief reply to that supplemental response on July 23, 2014. (Dkt. No. 67.)

1

between Defendant, McCallen, and Marshall; and (3) Government's Exhibit Two, a transcript of the grand jury testimony of Randi L. Shiben. The Court admitted into evidence Defendant's Exhibit One and Government's Exhibit One. Defendant objected to Government's exhibit Two. No other testimony was taken nor was any other evidence adduced.

## I. INTRODUCTION

*A. Background*

On April 1, 2014, Defendant was named in four counts of a five count indictment, all of which involve the distribution of controlled substances. Defendant now moves this Court to dismiss those charges because he alleges that he entered into a non-prosecution agreement with the Government and that he fulfilled his obligation under the agreement.

*B. The Motions*

1. Plaintiff's Motion to Dismiss for Breach of Non-Prosecution Agreement

*C. Recommendation*

I recommend that Defendant's Motion to Dismiss for Breach of Non-Prosecution Agreement be **DENIED** because there is no evidence that Task Force Officers acted with the United States Attorney's authority to promise Defendant immunity from prosecution.

## II. FACTS

On November 21, 2012, Officers McCallen and Baker met with Defendant to discuss the possibility of Defendant entering into a cooperation agreement with the Marshall County Drug Task Force whereby Defendant would make controlled buys of drugs in return for having alleged pending drug charges "erased." During this conversation, which was videotaped, the officers informed Defendant that in return for his cooperation, they could make any pending charges disappear, "but

[the cooperation] would have to be something substantial...We want the person that is bigger than you...You are going to have to buy from people until we think that you have done enough buys to validate you not going to prison for 10 to 15 years."

On November 30, 2012, Defendant met again with McCallen and Baker, this time to execute a two-page document entitled "Marshall County Drug Task Force Cooperating Individual Agreement."[3] The first page of the agreement, which consists of a list of seven "terms and conditions" to which Defendant indicated he agreed by initialing, was thoroughly explained to Defendant by McCallen. The second page of the agreement, which has blanks for writing in the assistance to be performed by the cooperating individual, the time frame for completion of that assistance, and what the cooperating individual gets in return for that assistance, was neither filled out by McCallen nor discussed with Defendant. Both Defendant and McCallen signed the agreement. After signing the agreement, Defendant discussed a potential drug buy he wanted to set up involving Amanda Barker, his current co-defendant in this case. Defendant informed the officers that the pills he was attempting to buy were so popular that if the buy did not happen right away, the dealer would run out of the pills. The officers informed Defendant they would be riding around all evening and Defendant could call them whenever he was ready. Defendant informed the officers that he only knew two drug dealers. The meeting ended amicably.

Sometime between the November 30, 2012, meeting and the first controlled buy on December 18, 2012, Officers McCallen, Baker, and Matthews arranged to meet with Defendant in Grand Vue Park. Defendant brought a friend to that meeting, explaining to officers that he was nervous about their agreement, that his friend worked for the courts, and that he wanted her to be

---

[3]Defendant's Exhibit One

3

there to help him understand the agreement. The officers testified that they warned Defendant he could not bring third parties to their meetings in the future and that they set up another meeting, but that they did not inform Defendant that he had breached the agreement or that the agreement was void. Matthews testified that while it upset him that Defendant brought a woman to the meeting, but that "as a consequence of the woman being there...it didn't sort of quash the deal...of [Defendant] being a CI." Shortly thereafter, on or about December 18, 2012, Defendant participated in a controlled buy of morphine from Amanda Barker in return for $40. Officer McCallen testified as follows regarding other attempts to set up controlled buys after the agreement was executed:

> A. He made one buy [the Barker buy], and after that he tried to contact me twice that I recall and he tried to set up a buy. He told me it had to happen in the next five or ten minutes, which he knew from our discussions before, we needed more ample time to set up a buy like he did for the Amanda Barker case.
>
> Q. But my question is did he contact you via telephone after the agreement was signed and on how many occasions?
>
> A. Mr. Miller–after those two occasions, he would contact me all the time. He'd see me in a parking lot, hey, I just saw you in the parking lot. There's probably 30 times, but they weren't work related. He would just say, I just seen you here, I just seen you there. So–
>
> Q. So, probably 30 times, right?
>
> A. Correct.

McCallen also testified that in addition to contacting him by phone, Defendant may have also sent him Facebook messages. Sometime after November 30, 2012, McCallen changed his phone number and did not provide the new number to Defendant. Baker testified that Defendant called him in an attempt to contact McCallen because Defendant could no longer get in contact with McCallen.

At some point in early 2013, the officers became aware that Defendant was allegedly still

4

selling large quantities of pills to one buyer. According to the officers, this information, coupled with their perception that Defendant was not attempting to make controlled buys or follow the rules of controlled buys, let them to decide the agreement was void. Matthews brought the evidence against Defendant to the United States Attorneys Office, where he testified that he told Mr. McWilliams that Defendant had been a cooperating individual and that Defendant had made a controlled buy. On April 4, 2014, Defendant was named in four counts of a five count indictment charging him for four instances of alleged drug distribution predating the November 30, 2012 agreement.

### III. MOTION TO DISMISS

*A. Contentions of the Parties*

Defendant contends that the charges against him must be dismissed because the indictment violates the non-prosecution agreement he made with the Task Force officers. He asserts that he fully performed his side of the agreement, but that officers cut off communication with him and charges were brought. The United States argues that even if such an agreement exists, Defendant materially breached its terms. The United States also contends that the Task Force officers lacked the authority to bind it to a non-prosecution agreement in the first place.

*B. Discussion*

"Nonprosecution agreements, like plea bargains, are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." *United States v. Castaneda*, 162 F.3d 832, 835 (5th Cir. 1998). To enforce a nonprosecution agreement, the Court must determine (1) that a valid agreement was made; and (2) that the defendant performed his side. *United States v. McHan*, 101 F.3d 1027 (4th Cir. 1996); *United States v. Cooke*, 650 F. Supp. 991, 993 (D.Md.

1987) The burden of proving that an agreement was made is on the Defendant. *Id.* If the Defendant meets this burden, the Government must then prove, by a preponderance of the evidence, that the defendant materially breached the agreement. *Castaneda*, 162 F.3d at 836 ("When the government believes that a defendant has breached the terms of a nonprosecution agreement and wishes to be relieved of performing its part of the bargain-here, refraining from prosecuting the defendant-due process prevents the government from making this determination and nullifying the agreement unilaterally. Instead, the government must prove to the court by a preponderance of the evidence that (1) the defendant breached the agreement, and (2) the breach is sufficiently material to warrant rescission."); *United States v. Gerant*, 995 F.2d 505, 508 (4th Cir. 1993) (holding that the breach of a non-prosecution agreement must be proved by a preponderance of the evidence). Finally, even where a non-prosecution agreement clearly exists and the defendant clearly performed his side, the agreement is only enforceable against the United States if it was entered into by a party acting with the authority to bind the United States Attorney to a non-prosecution promise. *United States v. Juvenile Male*, 1988 WL 138688, at *2 (4th Cir. 1988) ("The United States government generally is not bound by its agent's promise to a criminal defendant unless the agent acts with the government's authority.").

a. Existence of an Agreement

Thus, the first question before the Court is whether a non-prosecution agreement was made. To show that an agreement was made, Defendant "must demonstrate at least a meeting of the minds that the [G]overnment would refrain from ... prosecuting him in exchange for his cooperation." *McHan*, 101 F.3d at 1034. In this case, there is really no question that McCallen and Baker promised Defendant he would not be prosecuted if he cooperated with their drug investigation. Defendant and

McCallen signed a two-page "Cooperating Individual Agreement," under which Defendant agreed to "assist the Marshall County Drug Task Force." Although the written agreement is silent with regard to exactly what assistance Defendant would have to perform, as well as what he would be getting in return for his cooperation, videotaped conversations between Defendant and the Task Force officers clearly show that the parties contemplated that Defendant would be making controlled drug buys at the direction of law enforcement in return for his pending drug charges being "erased." *See Vergara*, 791 F.Supp. at 1099 (analyzing the signed "Cooperating Individual Agreement" in conjunction with the rest of the record and concluding that "it is clear that [the signed agreement] is but part of a more comprehensive, unwritten agreement with the government in this case").

The record clearly shows that the officers made very definite promises to Defendant that if he gave them "substantial" cooperation and did "enough buys to validate [him] not going to prison for 10 to 15 years," then his charges would disappear and be wiped away. *Cf. United States v. Blackmon*, 2005 WL 1719106 (M.D.N.C. July 21, 2005) (holding that no meeting of the minds existed concerning non-prosecution where officers merely made "nebulous statements suggesting that [defendant's] cooperation could possibly result in her freedom, [but] none were definite enough to constitute an offer of immunity"). In fact, McCallen testified that it was understood by Defendant and the officers that if Defendant performed "substantial assistance," there would be no charges brought for his conduct before November 30, 2012. Thus, the signed agreement, along with the videotaped conversation between Defendant, McCallen, and Baker, clearly demonstrate a meeting of the minds between the task force officers and Defendant that he would not be prosecuted for his alleged pending charges in return for his cooperation.

b. Material Breach

Having found that a non-prosecution agreement existed, the next question is whether Defendant performed his side of the agreement. The United States contends that under the terms of the agreement, Defendant was only authorized immunity if his cooperation was "substantial," and that because Defendant "did not do something substantial," he materially breached the terms of the agreement. The United States asserts that Defendant merely set up one minor controlled buy and half-heartedly attempted to set up two more before cutting off all contact with Task Force Officers. The United States also argues that Defendant breached other terms of the agreement by continuing to sell drugs and by bringing a third party to one of the meetings he had with the officers. The Court finds the United States's arguments unpersuasive.

As an initial matter, the terms of the agreement are not nearly as certain and definite as the United States asserts they are. As noted above, the actual signed agreement is silent as to key elements, such as "Assistance to be performed by C.I.," "Time Frame for completion of Assistance by C.I.," and "Proposed Plea Agreement upon successful completion of assistance by C.I." Although the United States claims that Defendant was clearly informed that his cooperation must be substantial and he must help officers nab someone "higher up than him," the videos tell a different story. While the officers did tell Defendant they wanted "the person that is bigger than you....You are going to have to buy from people until we think that you have done enough buys to validate you not going to prison for 10 to 15 years," Defendant repeatedly replied to these types of statements by telling officers that he really only knew a few dealers and that he was unsure if he could get someone "bigger" than him. Additionally, although the officers testified that they made this condition clear to Defendant during the November 30 meeting at which the agreement was signed, in reality, officers only mentioned this condition at the earlier, November 21 meeting. No

mention was made of any conditions on November 30 when the written agreement was executed, and, in fact, Defendant continued to advise the officers that he did not know any major drug dealers. It seems highly unlikely that Defendant would agree to help officers nab a drug kingpin all the while proclaiming that he did know any drug kingpins.

The officers also testified that Defendant was fully aware that he was required to give them advanced notice of a drug buy. The United States argues that this refusal on Defendant's part to "follow the rules by allowing sufficient time to do the pre-buy procedures" indicates that Defendant "really [did] not want to do the deal." Again, this term does not appear in the written agreement and there was absolutely no mention of such a requirement in the videotaped conversations. In fact, the only mention of a time requirement came when Defendant advised the officers the dealers he knew were running out of pills so fast that the deals had to be done right away. Moreover, to the extent there was any ambiguity regarding what was expected of Defendant, the government must bear its burden. *Untied States v. Vergara*, 791 F.Supp. 1095, 1101 (N.D.W.Va. 1992) ("Where the government has chosen not to memorialize the terms of such an agreement, it may not wield the imprecision or ambiguity to its advantage."). "[I]n the absence of an agreement, *clearly* understood by all of the parties, *carefully* memorialized, and *fully* disclosed to the Court, the government must bear the disadvantage of ambiguity or omission." *Id*. at 1100. In its response brief, the United States asserts that this holding of *Vergara* does not apply here because "the agreement was clear, carefully memorialized and fully disclosed." As noted above, the officers did not even bother to fill out the entire written agreement, much less memorialize all of the terms they now claim were perfectly clear to Defendant before he signed.

Further, even assuming that the agreement included the conditions that Defendant provide

9

substantial cooperation and give officers an hour notice before setting up controlled buys, the United States's contention that Defendant failed to comply with these terms and cut off contact with the officers is factually inaccurate. The uncontroverted evidence shows that Defendant repeatedly called McCallen and that McCallen eventually changed his cell phone number but did not give it to Defendant. In fact, Baker testified that Defendant once called him in an attempt to get in contact with McCallen. Thus, contrary to the Untied States's assertions, Defendant did not cut off contact with the officers, and the United States's argument that Defendant failed to "follow through with the agreement" because he "fail[ed] to properly set up any more deals" is simply not supported by the record.

Finally, the United States presented testimony regarding other conduct of Defendant that it claims constituted a breach of the agreement. First, the United States contends that Defendant continued to sell substantial amounts of pills despite agreeing not to possess or sell drugs and despite his repeated assertions that he did not know any other drug dealers. Second, the United States contends that Defendant violated a term of the agreement that he not discuss his cooperation with anyone when he brought a friend to a meeting with officers. While the record shows that the government may have waived these breaches, it is unnecessary for the undersigned to decide whether these actions, to the extend they are factually supported, constituted material breaches of the agreement because, as discussed below, even if Defendant substantially performed his obligations under the agreement, there is no evidence the officers had the authority to bind the United States Attorney's Office.

c. Authority to Bind

As noted above, even where an agreement exists and the defendant fully performed his side,

10

the agreement cannot be enforced against the United States Attorney unless it was entered into by one with the authority to bind the United States Attorney. The United States asserts that Defendant's motion should be denied because "non-prosecution promise[s] made by state detectives [are] not binding upon the United States." However, while it is true that *state* law enforcement officers would generally not have any authority to bind the *federal* government to a non-prosecution agreement, the record reveals that at all relevant times, McCallen and Baker were acting in their official capacities as members of the Marshall County Drug Task Force, which operates under the auspices of the federal government. *See United States v. Vergara*, 791 F.Supp. at 1099. Nonetheless, even an agent of the federal government cannot bind the United States Attorney to a non-prosecution agreement unless the agent acts with the United States Attorney's authority. *United States v. Juvenile Male*, 1988 WL 138688, at *2 (4th Cir. 1988) (Secret Service agents lacked authority to enter into non-prosecution agreement); *United States v. Fuzer*, 18 F.3d 517, 520 (7th Cir.1994) (Alcohol, Tobacco, and Firearms agents lacked authority to bind the United States Attorney); *United States v. Flemmi*, 225 F.3d 78, 87 (1st Cir. 2000) (FBI agents lacked authority to bind the United States Attorney).

In determining whether a party was authorized to promise non-prosecution, "it is the United States Attorney's actions in immunity negotiations that are the focal point in determining whether a party other than the United States Attorney can bind that office." *United States v. Blackmon*, 2005 WL 1719106 (M.D.N.C. July 21, 2005). Thus, the United States Attorney must be involved in the creation of the non-prosecution agreement, or, at the very least, consulted or informed about the planned agreement prior to its inception. *See, e.g., Id.* (concluding that the United States Attorney "did not act in any way to confer actual or apparent authority upon either the Louisiana State Police

or the DEA" where the evidence showed that the officers did not consult with the United States Attorney's prior to entering into an agreement with the defendant and where the defendant did not present contradictory evidence showing any involvement of the United States Attorney's Office prior to its initiation of her prosecution); *United States v. Vergara*, 791 F.Supp. 1095, 1095-96, 1099 (N.D.W.Va. 1992) (holding that Narcotics Task Force officers had the authority to bind the United States Attorney where the officers consulted with the Assistant United States Attorney prior to their contact with the defendant and where the defendant was made to understand their affiliation with the United States Attorney); *Juvenile Male*, at *2 (finding that Secret Service agents lacked the authority to make non-prosecution promises on behalf of the United States Attorney because the agents did not consult with or receive authorization from the United States Attorney prior to making the promises, and, therefore, the United States Attorney's Office "simply did nothing that could be construed as giving the Secret Service agents either actual or apparent authority to enter into an immunity agreement").

Here, the United States presented uncontroverted testimony that Task Force officers did not request authorization for immunity from the United States Attorney's Office nor did they inform the United States Attorney's Office of their intent to enter into an agreement with Defendant. At no time did the officers discuss any federal affiliation, nor did they inform Defendant they were working on behalf of the United States Attorney. In fact, the evidence shows that the United States Attorney was not informed of the non-prosecution agreement until almost a year and a half after it was made and, even then, only once charges were initiated. The undersigned finds that the United States Attorney simply did nothing in the case that could be construed as giving the Task Force officers authority to bind it to a non-prosecution agreement.

## IV. RECOMMENDATION

In sum, the undersigned recommends that Defendant's Motion to Dismiss for Breach of Non-Prosecution Agreement (Doc. 22) be **DENIED** because even assuming that an agreement between the Task Force officers and Defendant existed and that Defendant performed his side of the agreement, there is no evidence that the Task Force officers acted with the authority or permission of the United States Attorney's Office; therefore, the United States Attorney cannot be bound to the nonprosecution agreement. Defendant has filed two additional motions, a Motion to Dismiss Superseding Indictment for Vindictive Prosecution (Doc. 64) and a Motion to Dismiss for Outrageous Government Misconduct (Doc. 73). The undersigned will hold a motion hearing on both motions on **Wednesday, August 13, 2014, at 9:30 a.m.** in Wheeling, Magistrate Judge Courtroom, 4th Floor.

Because trial is imminent, any party who appears *pro se* and any counsel of record, as applicable, may, within **seven (7) days** after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 5, 2014

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE